## COVINGTON v. BRIGMAN.

### In re EAGLE PHARMACY.

(District Court, E. D. North Carolina. January 30, 1914.)

No. 349.

1. BANKRUPTCY (§ 303*)—VOIDABLE PREFERENCES—ACTIONS TO SET ASIDE—EVIDENCE.

In an action by a trustee in bankruptcy to set aside as a fraudulent preference a mortgage on a stock of goods, registered some time after its execution, evidence *held* to show that the mortgagee at the time of such registration had reasonable cause to believe that the mortgagors were insolvent, and that the registration of the mortgage would effect a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

2. BANKRUPTCY (§ 166*)—VOIDABLE PREFERENCES—KNOWLEDGE AND INTENT OF PARTIES.

Under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445) as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799, and Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506) which provides that if a bankrupt shall have made a transfer of any of his property, and if at the time of the transfer, or of the recording or registering of the transaction, if by law recording or registering is required, and being within four months before the filing of the petition, the bankrupt be insolvent and the transfer then operate as a preference, and the person receiving it shall then have reasonable cause to believe that the enforcement of such transfer would effect a preference, it shall be voidable by the trustee, where a chattel mortgagee, at the time of registering the mortgage some time after its execution, had reasonable cause to believe that the mortgagors were insolvent, and that the mortgage registered at that time would effect a preference, it was not necessary that the mortgagors should have intended to give a preference, or, if they did so intend, that the mortgagee should have had reasonable cause to believe that such intention existed.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. § 166.*]

3. BANKRUPTCY (§ 166*)—VOIDABLE PREFERENCES—NECESSITY OF REGISTRATION OF MORTGAGE.

Under the registration laws of North Carolina, a chattel mortgage is required to be registered within the meaning of such section of Bankruptcy Act, July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799, and Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. § 166.*]

4. BANKRUPTCY (§ 166*)—VOIDABLE PREFERENCES—KNOWLEDGE AND INTENT OF PARTIES.

Under such section, where a chattel mortgagee, who registered his mortgage some time after its execution, had reasonable cause to believe that the mortgagors were insolvent, and that the mortgage would then operate as a preference, it was a voidable preference, though at the time of its execution it did not effect a preference; as "then" in the statute refers to the date of registration.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. § 166.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. BANKRUPTCY (§ 168*)—VOIDABLE PREFERENCES—DISPOSITION OF PROCEEDS
   OF PROPERTY RECOVERED.
       Where a transfer by a bankrupt is found to be a voidable preference,
   the trustee is entitled to recover the value of the property for administra-
   tion in accordance with the provisions of the bankruptcy law, though
   some of the bankrupt's debts were contracted subsequent to the transfer.
       [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 234; Dec.
   Dig. § 168.*]

6. CHATTEL MORTGAGES (§ 185*)—VALIDITY AS TO CREDITORS.
       Where, though a chattel mortgage on a stock of goods contained no
   provision that the mortgagors were to remain in possession, sell the goods,
   and use the proceeds, such was the understanding of the parties, and
   there was a tacit understanding that the mortgage would be withheld
   from record, it was fraudulent as against creditors.
       [Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 367,
   369-371; Dec. Dig. § 185.*]

In Equity. Bill by Leake S. Covington, trustee in bankruptcy of
the Eagle Pharmacy, to set aside as a voidable preference, a mortgage
on a stock of merchandise, etc., executed to J. W. Brigman by the
bankrupts. Decree for plaintiff.

Cansler & Cansler, of Charlotte, N. C., for plaintiff.
John P. Cameron, of Rockingham, N. C., and H. F. Seawell, of
Carthage, N. C., for defendant.

CONNOR, District Judge. [1] On January 16, 1911, defendant
sold to his son, Orlando Brigman, and B. T. Dawson, a stock of drugs
and fixtures, including a soda water fountain, located in a storehouse,
the property of his wife, in the town of Rockingham, N. C. He had,
for some time prior thereto, been carrying on the pharmacy and drug
business, under the name and style of the Eagle Pharmacy. The stock,
fixtures, and fountain constituted the only assets of said business, sub-
ject to an indebtedness of about $2,700. An inventory of said stock,
fixtures, and fountain, taken a short time prior to said date, showed
its cost price to be, approximately, $6,300. The actual cash value of
the stock was estimated by B. T. Dawson to be about $2,000, and fix-
tures, including the soda fountain, about $1,300. The operation of the
business had not been profitable. Dawson was, at the time of the
sale, and had been for some eight months prior thereto, employed by
defendant as clerk. The sale was made for the sum of $3,500, pay-
able in 12 quarterly installments of $300 each (the last being $200),
for which amounts the purchasers executed their notes, payable to de-
fendant. For the purpose of securing the payment of said notes, said
purchasers, trading as the Eagle Pharmacy, executed to defendant a
mortgage on said stock and fixtures, bearing date January 16, 1911.
Said mortgage was deposited by defendant in the bank, without regis-
tration.

On August 3, 1911, upon the advice of his attorney, who was the
attesting witness thereto, and after default in the payment of two of
the notes at maturity, defendant caused his mortgage to be probated
and recorded in the office of the register of deeds for Richmond coun-
ty. Pursuant to an understanding with defendant, the purchasers took

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

immediate possession of the stock of goods, rented the storehouse from defendant's wife, at a monthly rental of $50 and continued the business, in the name of the Eagle Pharmacy—selling the goods and making purchases of other goods intermingled with the original stock in the usual course pursued by a retail drug store.

On November 25, 1911, defendant instituted an action, in the state court, against the said purchasers and mortgagors, on the notes then due, and for the foreclosure of said mortgage. He took possession of the stock of drugs then on hand, fixtures, and soda fountain. At the date of the sale of said stock, January 16, 1911, neither said Orlando Brigman nor T. B. Dawson owned any property other than the stock purchased from defendant. Their financial condition was well known to defendant. They paid, on account of the notes, prior to November 25, 1911, $700, and, pursuant to an understanding had with defendant, at the time of making the purchase, drew from the proceeds of sales of goods each, $100 a month, and discharged approximately all of the indebtedness of $2,700 assumed by them. They made purchases of goods approximating $7,000, and were indebted on account thereof, November 25, 1911, in the sum of about $2,800. At the date of the registration of the mortgage, August 3, 1911, the Eagle Pharmacy was insolvent. An examination of the claims filed indicates that a considerable portion of their indebtedness is for purchases made subsequent to August 3, 1911. Defendant says that the reason which induced him to have the mortgage registered was that they had not paid him the notes falling due in July and August, and that they were not giving proper attention to the business; that after he told his attorney that the mortgage was not registered, he became uneasy—thought it would have been better if he had registered it instead of leaving it in the bank—his attorney told him that he "had better have it registered." He did not give his reasons for so advising him. He thought, after he got the mortgage on the record, he would come in ahead of the general creditors—that was the reason he put it on record. He says that he had no intention of hindering and delaying other creditors when he put the mortgage on record. Dawson testifies that, at the time of making the sale, defendant said to him—

"there was no need to mention how we bought the property. There was no need for anybody to know anything about it."

Orlando Brigman did not testify in this cause. The appraisers appointed, in the proceeding in bankruptcy, assessed the goods on hand, at the date of the adjudication, at $2,731.70, of which $394.85 were purchased subsequent to January 16, and prior to August 3, 1911, and $864.14, between August 3, and December 2, 1911. They assess the soda fountain at $837.50, and the show cases at $517.50. There was, at the date of the sale, a valid lien on the soda fountain, for $217, which was due and unpaid at the date the defendant took possession of the property. Dawson testifies that the value of the goods and fixtures on hand August 3, 1911, was about $4,000, and the debts about $6,000. They inventoried more than that amount.

On June 28, 1911, Dawson made a statement to J. W. Cole, representative of Bradstreet, that the firm owned "merchandise at cost, and

fixtures, $6,000," notes and accounts $800; that their indebtedness amounted to $1,500, and that there were no notes, liens, or mortgages outstanding upon the stock and fixtures; that the sales, during the year, amounted to $12,000. Dawson knew that said statement was made as a basis of credit and was untrue. This statement was issued by Bradstreet & Co. to their subscribers. John M. Scott & Co., one of the petitioning creditors herein, took said statement from Bradstreet & Co. None of the creditors knew of the existence of the mortgage until after November 25, 1911.

On December 2, 1911, a petition was filed by certain creditors of Brigman and Dawson, trading as the Eagle Pharmacy, in the District Court of the United States for the Eastern District of North Carolina, praying that said firm be adjudged involuntary bankrupts, and on February 8, 1912, upon proceedings had therein, said parties were adjudged bankrupts, and on February 20, 1912, plaintiff, Leake S. Covington, was duly elected and qualified as trustee of said bankrupts. Pursuant to an order made in said proceeding, plaintiff took the said stock and fixtures into his possession, and thereafter sold the same, free of incumbrances, for the sum of $3,000, and holds the proceeds subject to the orders of the court. On July 6, 1912, the plaintiff filed this bill, praying that the said mortgage be declared invalid as against himself as trustee. The cause was, upon the maturity of the pleadings, brought to a hearing, etc.

Plaintiff attacks the mortgage of January 16, 1911, registered August 3, 1911, for that: First. It is a voidable preference under the provisions of section 60b of the Bankrupt Act of 1898, as amended in 1903 and 1910. Second. That it is fraudulent and void as against creditors under the statute in force in this state. Revisal 1905, § 960.

[2] The terms of the mortgage do not include purchases made subsequent to the date of its execution. It is therefore manifest that, quoad the portion of the stock on hand, at the institution of the proceeding in bankruptcy, December 2, 1911, purchased subsequent to January 16, 1911, the plaintiff is entitled to recover. The value of such portion is assessed by the appraisers at $1,258.99. The solution of the question in regard to the remaining portion is dependent primarily upon the construction of section 60b of the Bankrupt Act, as amended by the Acts of 1903 and 1910. It is manifest that, at the date of registering the mortgage, the debtors being insolvent, a preference was given defendant, and upon proceedings began within four months thereafter they were properly adjudicated involuntary bankrupts. Whether the mortgage is a voidable preference at the suit of the trustee is dependent upon whether defendant, at the date of its registration, had reasonable cause to believe that the mortgagors were insolvent, and that the mortgage registered, at that time, would effect a preference within the definition of that term as used in the Bankrupt Act. It will be well to keep in mind the fact that, since the amendment of 1903 to section 60b, it is not necessary to allege or show, either that the debtor, in making the transfer or executing the mortgage which operates as a preference, intended to make a preference, or, if in fact he had such intention, that the creditor receiving such preference had reasonable cause to believe that such intention existed. Meeting and making

provision against the effect of the decisions of the Supreme Court, which, in the opinion of Congress, rendered the act, in its original form, ineffective to remedy the evils which it was intended to eliminate, in regard to liens withheld from registration, the amendment of 1903 and 1910 were adopted and incorporated into section 60b, which deals with voidable preferences, and provides that:

"If a bankrupt shall have  *  *  *  made a transfer of any of his property and if, at the time of the transfer,  *  *  *  or, of the recording or registering of the transaction, if, by law recording or registering thereof, is required, and being within four months before the filing of the petition in bankruptcy,  *  *  *  the bankrupt be insolvent and the  *  *  *  transfer *then* operate as a preference, and the person receiving it, or to be benefited thereby  *  *  *  shall *then* have reasonable cause to believe that the enforcement of such  *  *  *  transfer would *effect* a preference, it shall be voidable by the trustee and he may recover the property or its value from such person." Collier, Bankruptcy (9th Ed.) 784.

There would seem to be but little room for construction of this language. It is quite clear, especially in the light of the judicial construction of the language used in the statute prior to the adoption of the amendments and the evident purpose of the Congress in making them.

[3] That the mortgage, with which we are dealing, in the light of our registration laws, comes within the language of the statute is clear. As said by Judge Hook, in Bank v. Connett, 142 Fed. 33, 73 C. C. A. 219, 5 L. R. A. (N. S.) 148, 15 Am. Bankr. Rep. 662:

"To be sure an unregistered mortgage is not pronounced void absolutely and under all circumstances, but it is 'required to be recorded' in the sense in which that phrase is customarily used, and the language of requirement is similar to that employed in the registry law of most of the states."

Two of the elements entering into a voidable preference—insolvency of the debtor, at the time of registration, and registration within four months before the filing of the petition in bankruptcy—are shown either by uncontradicted evidence or by the record. The only question open to discussion is whether defendant had reasonable cause to believe *then*—that is, at the date of registration—that the enforcement of his mortgage would effect a preference. The state of his mind, in that respect, must be ascertained from an examination of his own evidence and the surrounding conditions and circumstances. The circumstances attending the sale and execution of the mortgage—the fact that the business had not been successful, the relation which the accumulated indebtedness bore to the value of the property sold, the agreement by the purchasers to pay $300 quarterly, the agreement that, in addition to the rent of $50 a month, the partners were to withhold each, $100 per month, for their personal use, the assumption of $2,700 indebtedness then due, the absence of any outside resources upon which they could draw to meet such a large draft on the business—were well calculated to create a belief in the mind of any reasonably intelligent man that the venture would soon be wrecked. He must have known that they would be compelled to replenish the stock by making purchases on credit. This is emphasized by the uncontradicted testimony of Dawson that, when the sale was made, defendant said to him and his son, the other purchaser, "that there would be no use telling people

about it—no use in mentioning the transaction, but just go on with the business."

The mortgage was kept off the record, and the business was continued under the same name and style, the assumed indebtedness of $2,-700, and the rent, was paid, $700 of the purchase money paid before the mortgage was recorded, and each partner drew out $100 a month. The defendant lived in the same town with the purchasers, and "occasionally came in," etc.; one of them had been his clerk, the other was his son. Two notes were overdue when defendant consulted his attorney and, upon his advice, caused his mortgage to be probated upon the oath and examination of his attorney and recorded. Conceding that there was no express agreement between the parties at the date of its execution that the mortgage was not to be recorded, the fact is that it was not registered until more than six months after its execution. That he registered it "because he believed that he would get a lien on the property then"; they (mortgagors) "didn't come up, and I talked with Mr. Cameron [his attorney], and I went and had it recorded. * * * After he told me, I was uneasy. I thought it would have been better, maybe, if I had had it registered instead of leaving it in the bank."

To the question, "You thought after you got that paper on record you would come in ahead of the general creditors?" He answered, "Yes." He says that he had no intention to hinder or delay the other creditors when he put the mortgage on record. There is abundant evidence, coming from defendant, that, although an illiterate man, he had previously, acting for his wife, engaged in a number of transactions in which he had taken mortgages and had them recorded. The inference is irresistible that he knew that the law required its registration to make it effectual against the creditors of the mortgagors.

[4] A careful consideration of the evidence, heard by me orally, together with the demeanor of defendant as a witness, compels me to reach the conclusion that he knew, or certainly had reasonable cause to believe, on August 3, 1911, that the mortgagors owed debts, including his own, in excess of their assets. As he said, he was "uneasy" about his mortgage after talking with his attorney; he thought that, by its registration, "he would come in ahead of the general creditors." It is argued for defendant that knowledge of the fact that the enforcement of the mortgage would effect a preference relates to the date of its execution, and not its registration. From this postulate, it is further argued that, on January 16, 1911, the purchasers did not owe any debts other than the purchase money, and therefore the mortgage could not effect a preference. The difficulty encountered by defendant is that the word "then," found in the statute, manifestly refers to the date of registration. If the mortgage is required to be registered and the mortgagor be insolvent, and *then* operate, that is, at the date of its registration, as a preference and if the party benefited thereby *then*, that is, at the time of its registration, have reasonable cause to believe, etc., it is a voidable preference. This was so held in Bank v. Connett, 142 Fed. 33, 73 C. C. A. 219, 5 L. R. A. (N. S.) 148, 15 Am. Bankr. Rep. 662. There the question is clearly presented and decided. The mort-

gagor was insolvent at the date of the transaction, but the creditor had no knowledge, or reasonable cause to believe, that such was his condition. At the date of the registration of the mortgage, he was likewise insolvent, and his condition was *then* known to the mortgagee; this was within four months prior to the petition in bankruptcy. Judge Hook says:

"The preference arose when the mortgages were recorded, and not as of the date they were given. In other words, the amendment of 1903 was intended to remedy the evil resulting from secret instruments of transfer of the bankrupt's property, the withholding of them from record until shortly before the institution of bankruptcy proceedings, and the then assertion of them as of the prior date of their execution and delivery. And this was accomplished by making the rights of a creditor, thus favored, determinable by the conditions existing when he caused the transfer to him to be recorded as required by the state law, rather than by those existing at the time he secured it."

The learned judge states a condition, existing in that case, which accurately describes the conditions in the instant case.

"The mortgages of the bank, required by law to be recorded, having been recorded within four months of the filing of the petition in bankruptcy, and at a time when the mortgagor was insolvent, the effect thereof being to enable the bank to obtain a greater percentage of its claims than other creditors of the same class, a preference arose under section 60a. Was it voidable under section 60b? In other words, did the bank have reasonable cause to believe that it was intended thereby to give a preference? The bank knew that the mortgagor was insolvent, and that a preference was in fact then created, but, in a strict sense, it cannot be said that it had reasonable cause to believe that one was intended. While the situation is somewhat anomalous, we believe that it was within the spirit of the amended act, and that the voidable element is established by the knowledge of the bank when its mortgages were recorded that the mortgagor was insolvent and contemplated a disposition of his property."

The same view is adopted by Judge Cochran in Ogden v. Reddish (D. C.) 200 Fed. 977. After defining a voidable preference under section 60b, as amended, he says:

"These three things must have existed at either of two particular times, to wit: Either at the time of making the mortgage, or at the time of its recording."

These decisions commend themselves to the judgment as being correct interpretations of the present provisions of section 60b. They are in accordance with a natural and reasonable construction of the language of the section, and are sustained by the history of the statute and its amendment to meet conditions presented by the decisions of the court.

[5] The fact is stressed in the argument that a large portion of the debts due the petitioning creditors were contracted subsequent to the registration of the mortgage. An examination of the proofs of debts, aggregating some $2,800, discloses that a portion of the indebtedness of the bankrupts was contracted prior to August 3, 1911, and the bankrupts were, by the withholding of the mortgage from registration by defendant, permitted to, and did in fact, hold themselves out and obtain credit as being solvent and their property free from liens or incumbrances. The evil which Congress intended to prevent is found in this

case. Without discussing the question as to the rights of creditors, whose debts were contracted after the registration of the mortgage, it is sufficient to say that the trustee represents all of the creditors and recovers for their benefit. The question upon which this decision goes does not involve the validity of defendant's debt, or the intent with which the mortgage was executed by the bankrupts, or accepted or recorded by defendant. The rights of the trustee are controlled by the establishment of the essential facts, prescribed by the statute, constituting a voidable preference. As they are found in the record, the result follows that the mortgage creates a voidable preference, and the plaintiff trustee is entitled to recover the value of the property, or, upon the facts appearing, to retain the proceeds in his hands and administer them in accordance with the provisions of the Bankrupt Law.

[6] This conclusion renders it unnecessary to consider the other contention made by plaintiff that the mortgage is fraudulent and void, under the construction of section 960 of the Revisal, by our state courts. In respect to the stock of drugs, it would be difficult to distinguish the case from Cheatham v. Hawkins, 76 N. C. 335, and other cases found in the North Carolina Reports. It is true that there is no provision in the mortgage that the mortgagors are to remain in possession and continue to sell the goods and use the proceeds; it is manifest that such was the understanding, between the parties, at the time the mortgage was executed, and it is uniformly held that such understanding has the same invalidating effect as if it was inserted in the instrument. The effect upon the parties and upon creditors is the same in either case. Mitchell v. Mitchell (D. C. N. C.) 147 Fed. 280, in which Judge Purnell says:

"Except for sinister purposes it is difficult to imagine why a party, holding a mortgage on a stock of merchandise, when the statute provides for its registration, should wish to secrete the mortgage, carry it in his pocket, instead of putting it on record, thus giving notice to the commercial world of the financial condition of the mortgagor. The well-earned character of the state of North Carolina and of its native population for honesty, favoring a square deal, is in keeping with the law as decided in Cheatham v. Hawkins, 76 N. C. 335," etc.

In re Duggan, 183 Fed. 405, 106 C. C. A. 51 (C. C. A. 5th Cir.), it is held that:

"A chattel mortgage given by a bankrupt on his stock of merchandise, and withheld from record for several months by the mortgagor, under a tacit agreement to do so because of the effect which the record would have on the mortgagor's credit, is fraudulent and void, both as to prior and subsequent creditors."

Judge Shelby, after citing decided cases, concludes:

"When the mortgage is declared void, the trustee holds the mortgaged property unincumbered by the mortgage, and it is subject to pro rata distribution just as any other property of the bankrupt." Bank v. Shackelford, 208 Fed. 677, 125 C. C. A. 575.

In Hafner v. Irwin, 23 N. C. 496, cited in Blennerhassett v. Sherman, 105 U. S. 100, 26 L. Ed. 1080, it is said:

"There was evidence tending to show that it was a condition of this instrument, and as understood between the parties thereto, that it should not

be registered nor put in use, but kept a secret from the world until after the 20th February, ensuing, etc. * * * We feel ourselves justified in holding that, when secrecy is a part of the consideration of such securities, the securities are contaminated thereby, and ought not to be regarded as given bona fide."

Such is the law as held by all courts; it is most salutary in its effect upon commercial credit, and promotes honest, fair dealing, and the protection of unsecured creditors, who extend credit to persons under the impression that their property is unincumbered. While it is argued here that there is no sufficient evidence to show an agreement to withhold the mortgage from the record, it must be conceded that there is much in the evidence and the conduct of the parties to sustain the inference that there was at least "a tacit understanding" to that effect. It requires no strained construction of the uncontroverted evidence to reach the conclusion that the purchasers of the stock could not have conducted the business without purchasing goods on credit, and that with this mortgage on the record they would have been unable to do so—no reasonably prudent merchant would have extended them credit—and all of this was well known to defendant. I have not considered the matters referred to in the amended answer. The defendant is not in a position, in this action, to raise the questions suggested by the averments therein. The sole question which can be litigated between plaintiff trustee and defendant is the validity of the mortgage of January 16, 1911, as against the rights of creditors represented by him as trustee.

A decree will be drawn declaring that, for the reasons stated herein, plaintiff is entitled to retain the proceeds of the property sold by him pursuant to the order heretofore made in the proceeding in bankruptcy, and to administer same in accordance with the provisions of the Bankruptcy Act. The plaintiff will recover his cost, etc.